A05A1914. MOBLEY v. THE STATE.
(626 SE2d 248)

MIKELL, Judge.

After a jury trial in Clayton County Superior Court, Daniel Lamont Mobley was convicted of two counts of armed robbery, aggravated assault, possession of a weapon during the commission of a crime, and two counts of possession of a firearm by a convicted felon. On appeal, Mobley challenges his conviction, arguing that the trial court erroneously denied his motion in limine to exclude evidence relating to the victim's pretrial eyewitness identification of him and his motion for additional funds to hire an eyewitness identification expert. Mobley also contends that his trial counsel was ineffective. Based on the reasons discussed below, we affirm.

On appeal from a criminal conviction, the evidence is viewed in the light most favorable to the verdict.[1] We do not weigh the evidence or determine witness credibility but only determine whether the evidence is sufficient under *Jackson v. Virginia*.[2] "The verdict must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[3]

The record shows that at approximately 11:00 a.m. on October 4, 2003, James Cornwall was sitting on a bench outside of his apartment after receiving a telephone call from someone to meet him. Cornwall testified that he carried a firearm for protection and had it with him when he went outside to the bench. A man, whom he described as big and chubby, sat next to him and asked for a cigarette. After giving the man a cigarette, Cornwall saw a bald man walk by, who was wearing army fatigues and a black shirt, whom he later identified as Mobley.

---

[1] See *Paul v. State*, 231 Ga. App. 528 (499 SE2d 914) (1998).
[2] 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).
[3] (Footnote omitted.) *Shelton v. State*, 260 Ga. App. 855 (1) (581 SE2d 378) (2003).

Mobley returned to the bench and another man, who had dreadlocks and was wearing a white shirt and blue pants, approached the bench from behind. Mobley brandished a weapon and grabbed Cornwall's gun. At that point, the man who initially sat by Cornwall ran away. Mobley told Cornwall to "give it up" and Cornwall gave him $120. Mobley loaded a bullet into the chamber of Cornwall's gun, but when he attempted to cock it, the bullet flew out onto the ground. After Mobley cocked the gun a second time, Cornwall ran away. Mobley shot at Cornwall as he ran away. Cornwall testified that during the ordeal, he had looked at Mobley for approximately four to five minutes.

Cornwall called the police immediately to report the incident. When they arrived, he showed them where he was robbed and gave descriptions of the perpetrators. The officers recovered a shell casing and a bullet, both of which they determined had been fired from the same caliber weapon as the one taken from Cornwall.

During the next two weeks, Cornwall saw Mobley and the man with the dreadlocks at his apartment complex on several occasions in a gray Dodge Stratus. Initially, Cornwall planned to retaliate on his own, but ultimately decided to inform the police of the perpetrators' presence at the apartment complex. On October 28, 2003, 24 days after the robbery, Cornwall told Captain Samuel Smith of the Clayton County Sheriff's Office, who was the courtesy officer for the complex, that he had been robbed and that the perpetrators could be found in apartment 9D. Smith asked for descriptions of the perpetrators, and Cornwall told him that one was a bald, short, heavyset black male, another was a taller, heavy black male who had a lighter complexion, and the third wore dreadlocks in his hair. Smith called for backup before investigating further.

Smith testified that when he first knocked on the door of apartment 9D, a black male came to the window and then walked away. When he knocked the second time, the tenant, Jamica Taylor, answered. Smith further testified that he told Taylor that he was investigating an armed robbery and asked if anyone else was in her apartment; that Taylor said that only her boyfriend was there and called him to the door; that he asked the boyfriend if he could step inside the apartment; that the boyfriend consented; and that he then saw two black males fitting the descriptions that Cornwall had given him. Smith identified the two men as Mobley and Christopher Wyatt.

Smith asked the men about the vehicle parked outside, then asked if anyone had car keys, at which point he noticed a change in Mobley's facial expression. Mobley gave Smith the keys from his pocket and when Smith asked what kind of vehicle he drove, Mobley told him a Ford pickup truck. Smith asked Mobley about the Dodge key on his key ring, and Mobley told him that it was the key to his

girlfriend's car, which was not parked at the complex. Smith then asked to take the key outside, and Mobley responded that he did not want the key checked unless Smith had a search warrant. Smith placed the keys on a table in the apartment, then told Mobley that he was going to handcuff him since he fit the description of a robbery suspect, had a key that might fit the car used in the robbery, and because Smith was concerned about his own safety.

Smith testified that he decided to do a physical lineup at the complex so that Cornwall could identify his assailants, using Mobley, Wyatt, a plain-clothes black officer, and Taylor's boyfriend. Smith made all of the men wear hats to obscure Wyatt's dreadlocks. Cornwall stood in front of an apartment building across the way as each man was escorted to the well-lit back door of the opposite building with his hands behind his back, and he and Smith communicated via cell phone. Smith testified that no one suggested which man Cornwall should pick and that nothing was done to Mobley to make him stand out. Cornwall identified the third and fourth men in the showup, respectively, Mobley and Wyatt. When Cornwall told Smith that he would like to get a closer look, Smith used a digital camera to take pictures of all of the men in the lineup and showed Cornwall the pictures in the order that he had displayed each man. Cornwall again identified Mobley and Wyatt. Smith showed Cornwall photographs of the men without hats, and Cornwall identified Mobley and Wyatt a third time.

Smith arrested Mobley and Wyatt and impounded Mobley's car. Before the vehicle was towed to the impound lot, Smith inventoried the items in the car and in so doing, found a backpack that contained two guns, one of which belonged to Cornwall. After Smith read Mobley his *Miranda* rights, Mobley admitted that Wyatt had been with him in the car that day but never identified the owner of the backpack. When asked about the robbery, Mobley denied that he robbed Cornwall and explained that he had been robbed as well. Mobley also said that he asked Cornwall for a "light" that day and ran away when some other guys came up to rob Cornwall, but he could not explain why Cornwall's gun was in the car to which he had a key.

1. In his first enumeration of error, Mobley argues that the trial court should have suppressed the evidence from Cornwall's pre-trial eyewitness identification for the following reasons: (1) Cornwall was convinced that the perpetrators were in the apartment, thus he anticipated that they would be included in the lineup; (2) the officer told Cornwall that the suspects in the apartment fit the descriptions he had given; (3) someone else advised Cornwall that the police had arrested the men before he identified them; (4) Mobley was in handcuffs during the identification procedure; (5) the showup occurred 24 days after the robbery was committed; (6) no evidence

documented the identification procedure; and (7) Smith altered Mobley's appearance when he required him to wear a hat. None of these reasons justify the reversal of the trial court's ruling.

"The test for determining whether a due process violation occurred in cases such as this is whether the identification procedure was so impermissibly suggestive as to give rise to a [very] substantial likelihood of irreparable misidentification."[4] However, where the court determines that the identification procedure was not impermissibly suggestive, it need not consider the likelihood of misidentification.[5] "The taint which renders an identification procedure impermissibly suggestive must come from the method used in the identification procedure."[6]

In this case, the identification procedure was utilized after Cornwall contacted the police and informed them that he had been watching the suspects and that he knew their location. Smith's statement to Cornwall that he had some guys that fit the descriptions given by Cornwall did not render the lineup impermissibly suggestive. Although "[a] police officer displaying a lineup to a victim or witness should avoid telling the person that the lineup contains the police officer's suspect . . . , such a statement does not make a lineup impermissibly suggestive since the very fact that a lineup is being conducted suggests that a suspect is contained therein."[7] Mobley's argument that someone told Cornwall that the police had arrested the men is unhelpful to him because lineups often contain persons who are obviously in custody. The fact that Mobley was the only suspect that was handcuffed during the procedure was unknown to Cornwall because the other three suspects were required to stand as if they, too, were handcuffed. Mobley's remaining arguments either lack merit or go to the likelihood of misidentification.[8] Therefore, we agree with the trial court's finding that the eyewitness identification evidence was admissible.

Even if we concluded that the lineup was impermissibly suggestive, we find that there was not a substantial likelihood that Cornwall misidentified Mobley. To make that finding, we are required to consider "(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy

---

[4] (Citation and punctuation omitted.) *Hood v. State*, 216 Ga. App. 106, 107 (2) (453 SE2d 128) (1995).

[5] See *Pace v. State*, 272 Ga. App. 16, 18 (3) (611 SE2d 694) (2005); *Clark v. State*, 271 Ga. 6, 13 (7) (b) (515 SE2d 155) (1999).

[6] (Citation omitted.) *Clark*, supra at 12 (7) (b).

[7] (Citations omitted.) Id. at 13 (7) (b).

[8] See id. (the fact that the lineup occurred sometime after the robbery goes to whether there was a substantial likelihood of misidentification).

of the witness' prior description of the criminal, [and (4)] the length of time between the crime and the confrontation."[9] Cornwall testified that the crime occurred during daylight and that he stared at Mobley for four to five minutes while Mobley held him at gunpoint. Cornwall's description of Mobley given to Smith before he entered the apartment was accurate. Although the officer who initially investigated the crime testified that Cornwall told him that the person who shot at him had a dark complexion and a low haircut, on cross-examination, Cornwall vigorously testified that the officer was incorrect and that he had described Mobley as bald with a light complexion. "It is the jury's prerogative to choose what evidence to believe and what to reject[,]"[10] and the jury obviously chose to believe Cornwall. Additionally, Cornwall testified that he was 100 percent sure that Mobley was the person who shot at him. Though the identification occurred 24 days after the crime was committed, given the totality of the circumstances, we find that there existed no substantial likelihood of irreparable misidentification.[11]

2. Next, Mobley argues that the trial court erred when it denied his motion for funds to hire an expert witness. We disagree.

"The granting or denial of a motion for funds to hire an expert witness lies within the sound discretion of the trial court. Unless there has been an abuse of discretion, the trial court's ruling will be upheld."[12] In a motion for funds to hire an expert, the defendant must make a reasonable showing as to why the expert's services are required, what services are to be performed by such expert, the identity of the expert, and the cost to provide the needed services.[13] "The defendant must also demonstrate that without the assistance of the expert, the defendant's trial would be rendered fundamentally unfair."[14]

Mobley's motion for funds was filed after the verdict was rendered and after he filed his motion for new trial, which alleged only the insufficiency of evidence and ineffectiveness of trial counsel.[15] In

---

[9] (Punctuation omitted.) *Heyward v. State*, 236 Ga. 526, 528 (1) (224 SE2d 383) (1976), citing *Neil v. Biggers*, 409 U. S. 188, 199-200 (III) (93 SC 375, 34 LE2d 401) (1972). Accord *Rogers v. State*, 265 Ga. App. 628, 629 (1) (595 SE2d 326) (2004). These decisions also mention consideration of a witness's level of certainty. Such consideration is now suspect, at least when instructing a jury. *Brodes v. State*, 279 Ga. 435, 440-442 (614 SE2d 766) (2005).

[10] *Trammell v. State*, 253 Ga. App. 725, 726 (1) (560 SE2d 312) (2002).

[11] See, e.g., *Davis v. State*, 216 Ga. App. 580, 582 (2) (455 SE2d 115) (1995) (two-month delay between crime and confrontation did not render identification unreliable).

[12] (Citation and punctuation omitted.) *McKinney v. State*, 269 Ga. App. 12, 14 (1) (602 SE2d 904) (2004).

[13] *Coalson v. State*, 251 Ga. App. 761, 766 (3) (555 SE2d 128) (2001).

[14] Id.

[15] Mobley amended his motion for new trial to add the errors alleged herein.

his motion, Mobley explained that he required the services of an expert in eyewitness identification to consult with his counsel regarding the reliability of Cornwall's eyewitness identification and to testify at the motion for new trial hearing as to the ineffectiveness of trial counsel for his failure to appropriately address the eyewitness identification evidence. He also indicated that the cost of the expert's assistance was $3,500. Attached to his motion was the affidavit of the proposed expert who opined as to several scientific theories related to the accuracy and reliability of eyewitness identification. The trial court's denial of the motion did not amount to an abuse of discretion.

At the hearing on the motion for funds, Mobley's counsel admitted that she had found no law entitling Mobley to the assistance of an expert on a motion for new trial. The trial court found that the expert's services were not needed because this was not an identification case since Mobley admitted that he was at the scene and that to allow such an expert would be tantamount to allowing one in every case to question a witness's recount of events. Mobley's argument that he needed the expert to prove his trial counsel's ineffectiveness also fails. During the hearing on the motion for new trial, Mobley's appellate counsel asked trial counsel numerous questions regarding scientific theories on eyewitness identification and trial counsel admitted that he had not reviewed all of the literature. The reasonableness of an attorney's representation is not to be judged in hindsight,[16] however, and the fact that another lawyer may have utilized different trial tactics does not render trial counsel's performance deficient.[17] The claim of ineffectiveness based on trial counsel's failure to adequately research the issue is discussed below.

3. In his third and fourth enumerations of error, Mobley argues that his trial counsel was ineffective because he failed to object to the state's characterization of Smith's entry into the apartment as "consensual" and adequately to research eyewitness identification evidence. We disagree.

"[I]n order to prevail on a claim of ineffectiveness of trial counsel, a defendant must show that his attorney's performance was deficient and that the deficiency prejudiced him such that a reasonable probability exists that, but for the attorney's errors, there would have been a different outcome at trial."[18] Furthermore, "[a] court . . . is not required to address the performance portion of the inquiry before the prejudice component or even to address both components if the

---

[16] See *Rice v. State*, 186 Ga. App. 111, 112 (2) (366 SE2d 322) (1988).

[17] See *McGill v. State*, 263 Ga. 81, 82 (2) (428 SE2d 341) (1993).

[18] (Citations omitted.) *Butler v. State*, 273 Ga. 380, 384 (10) (541 SE2d 653) (2001).

defendant has made an insufficient showing on one [and its] finding of effectiveness must be upheld unless clearly erroneous."[19]

(a) Mobley argues that his trial counsel should have objected to the state's terminology that Smith's entry into the apartment was consensual. "A warrantless entry into and search of a residence may be authorized by the consent of any person who possesses common authority over or other sufficient relationship to the premises to be searched."[20] Our Supreme Court has defined "common authority" as

[the] mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.[21]

In this case, the record shows that Smith knocked on the door and advised Taylor that he was investigating a crime. Subsequently, Taylor called her boyfriend to the door, who consented to the officers' entering the apartment. Smith testified that he did not threaten or otherwise force Taylor's boyfriend to allow him access to the apartment. Mobley has offered no evidence to negate the boyfriend's consent[22] or to show that the police should have known that he had no authority to give them consent to enter the apartment.[23]

When asked about this issue at the hearing on the motion for new trial, trial counsel testified that he thought an objection or motion on this ground would not have prevailed in light of the evidence. We agree as the failure to make a meritless objection does not constitute ineffective assistance of counsel.[24]

---

[19] (Citation and punctuation omitted.) *Green v. State*, 240 Ga. App. 650, 652-653 (3) (523 SE2d 632) (1999).

[20] (Punctuation omitted.) *Pledger v. State*, 257 Ga. App. 794, 798 (572 SE2d 348) (2002), citing *Smith v. State*, 264 Ga. 87-88 (2) (441 SE2d 241) (1994). "Once an officer physically enters a home, he is 'searching' it in that he is observing it with his senses." *Pledger*, supra at 797, n. 3.

[21] *Smith*, supra at 88 (2), citing *United States v. Matlock*, 415 U. S. 164, 171 (II), n. 7 (94 SC 988, 39 LE2d 242) (1974).

[22] See *State v. Jourdan*, 264 Ga. App. 118, 121 (1) (589 SE2d 682) (2003) ("[c]onsent which is the product of coercion or deceit on the part of the police is invalid") (citation, punctuation and footnote omitted).

[23] Compare *Pledger*, supra at 798 (police could not reasonably assume the man who authorized their entrance had the defendant's authority to allow them into her home in her absence where there was no evidence in the record establishing Pledger's relationship to the man).

[24] See *Herrington v. State*, 265 Ga. App. 454, 458 (594 SE2d 682) (2004).

(b) Mobley contends that trial counsel was ineffective because he did not conduct adequate research on the issue of eyewitness identification evidence. Mobley argues that had trial counsel conducted adequate research, he would have been able to "bring out in his examination of witnesses several of the factors that contributed to the overly suggestive and unreliable eye witness identification circumstances at play in this case." The record shows that trial counsel questioned Cornwall at length about his opportunity to observe his assailants and his identification of them. Trial counsel also cross-examined Smith vigorously about the identification procedure he utilized and argued the unorthodox nature of the procedure during his closing argument. Regarding the various scientific theories on eyewitness identification, trial counsel testified that he had heard of some of the theories and believed that some were accurate and others were not. Nonetheless, he thought that the various theories would not inure to Mobley's benefit since he had admitted to being at the scene of the crime. Trial counsel's decisions "with regard to the choice of defenses and theories to be advanced at trial, even if unwise, are deemed matters of tactic and strategy; as a matter of law, strategic decisions do not amount to ineffective assistance of counsel."[25] Accordingly, this ineffectiveness claim fails as well.

*Judgment affirmed. Andrews, P. J., and Phipps, J., concur.*

DECIDED JANUARY 19, 2006.

*Patricia F. Angeli*, for appellant.

*Jewel C. Scott, District Attorney, Bonnie K. Smith, Assistant District Attorney*, for appellee.

---

[25] (Citation and punctuation omitted.) *Fairclough v. State*, 276 Ga. 602, 605 (4) (581 SE2d 3) (2003).